***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner, the briefs and oral arguments of the parties before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby AFFIRMS and MODIFIES the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Lumbermen's Mutual Casualty Company was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Judicial notice may be taken of all Industrial Commission forms on file.
5. Plaintiff sustained an admittedly compensable injury on January 3, 1996, as a result of which the parties entered into a Form 21 Agreement. Plaintiff has received temporary partial disability benefits pursuant to the Form 21 from the date of the injury until June 7, 1996, when she was released to regular duty. With the Form 21 Agreement, defendants filed a sheet reflecting the calculations for wage loss differential for each week between January 7, 1996 and June 9, 1996.
6. Plaintiff's average weekly wage was $777.57, which yields the maximum compensation rate for 1996 of $492.00.
7. Pursuant to the January 31, 2002 Order, the parties stipulated into evidence the January 3, 1996 incident investigation report (one page); I.C. Form 19; Corning Interoffice Memoranda of February 1996 (five pages); Memo of Bruckner Supply Regional Office (one page); N.C. OSHA Report, dated March 21, 1996 (thirteen pages); 1996-97 Notes of the Plant Nurse; 1999-2001 Workers' Compensation file; 1993, 1994 and 1996 Workers' Compensation file; Disability and FMLA file; wage reports for comparable employee (eighteen pages); and a one-page note of Dr. Daniel Patterson.
8. In addition, the following documentary evidence was received into evidence at the hearing before the Deputy Commissioner in lieu of depositions: January 15, 2002 Report of Dr. Ramon B. Jenkins (ten pages); June 3, 2002 report (six pages), August 29, 2002 Opinion letter (two pages) and nerve studies (one page), and August 28, 2002 letter (one page) of Dr. E. Wayne Massey.
9. Judicial Notice is taken of the following:
a. Form 19, filed January 17, 1996,
b. Form 18, filed on March 1, 1996,
c. Form 33, filed on June 12, 1996,
d. Form 28, filed on August 3, 1996,
e. Form 28T, dated August 3, 1996,
f. Form 33R, filed July 2, 1996,
g. Form 28B, filed August 27, 1996,
h. Form 33, filed April 22, 1999,
i. Form 33, filed August 23, 1999,
j. Amended Form 33, filed April 10, 2000,
k. Opinion and Award, filed on October 20, 2000, and
 l. Amended Opinion and Award, filed on February 1, 2001.
10. The issues for determination by the Commission are whether plaintiff is entitled to benefits for permanent and total disability; does plaintiff retain a wage earning capacity; who should be designated as plaintiff's treating physician; should sanctions and penalties be assessed against defendants; what benefits may plaintiff be entitled to receive since June 7, 1996; are defendants entitled to have plaintiff examined by Dr. Ramon Jenkins prior to a decision in this case, following submission to Dr. Jenkins of a full compilation of all medical records for treatment rendered since April 1997.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty-eight years old. Plaintiff is right-hand dominant and is a high school graduate. She was employed with defendants for approximately nineteen years and performed a number of jobs for the fiber optic glass manufacturer. Plaintiff worked a twelve-hour shift for four days per week and regularly worked overtime, as available, during the course of her employment.
2. On January 3, 1996, plaintiff was performing her normal duties on the lay down job on the lathes. As she used a vacuum hose to clean the lathe, plaintiff experienced two mild electric shocks on her right side.
3. On January 4, 1996, occupational medicine specialist Dr. John Cromer examined plaintiff, at which time she reported a history of experiencing strong static charges. Plaintiff complained of numbness in the ring and small fingers of the right hand and down the right leg into her foot. Dr. Cromer prescribed anti-anxiety medication to help plaintiff sleep and authorized her to continue working full duty.
4. Dr. Sue Nelson restricted plaintiff from working in the area where the incident occurred for one week, as of January 12, 1996, due to plaintiff's fear of working in the area. Dr. Cromer continued restrictions to remove plaintiff from the pre-form and lay down area and to avoid tasks that pose a risk for static or electric shock because of plaintiff's high level of concern and anxiety. Thereafter, on February 19, 1996, plaintiff complained of foot pain while working overtime. Dr. Cromer restricted her to no overtime work until March 5, 1996.
5. By April 23, 1996, Dr. Cromer released plaintiff with no restrictions to full duty work. In May of 1996, plaintiff reported migraine variant headaches to Dr. Cromer, which he related to tension. Plaintiff was authorized to continue full duty work.
6. On July 24, 1996, Dr. Cromer noted plaintiff should not work overtime until he released her. However, she continued to work her regular job schedule.
7. Defendants paid temporary total disability benefits to plaintiff pursuant to the I.C. Form 21 Agreement for Compensation, which was approved by the Industrial Commission on September 30, 1996. Defendants' Form 28B reflects plaintiff last received monetary compensation on August 22, 1996.
8. Dr. Cromer referred plaintiff for an evaluation by Dr. Ramon B. Jenkins, a specialist in electrical shock injury. On April 16, 1997, Dr. Jenkins took a history of injury and symptoms from plaintiff, examined her, and reviewed treatment. Based in part on plaintiff's subjective complaints of pain in the entire right side of her body, Dr. Jenkins felt the electric shock was not the likely organic cause of her symptoms, as these complaints were not logical based upon normal anatomy and physiology, nor under the terms of electrical theory. Following his evaluation and review of all information, Dr. Jenkins found no evidence of permanent physical damage to any portion of plaintiff's body as a result of the incident of January 3, 1996.
9. On April 28, 1997, Dr. Cromer released plaintiff from his care after reviewing Dr. Jenkins' findings. Dr. Cromer authorized plaintiff to return to full duty work without restrictions and reviewed in detail Dr. Jenkins' findings with plaintiff.
10. Plaintiff was out of work on personal leaves of absence, unrelated to the electric shock injury, from December 9, 1997 through December 15, 1997; from March 21, 1998 through March 27, 1998; and from September 7, 1998 through September 27, 1998.
11. Plaintiff did not receive any further medical treatment for her compensable injury until February 19, 1999, when she returned to Dr. Cromer with complaints of persistent right arm and hand pain. Dr. Cromer suspected ulnar neuralgia for which he prescribed Neurontin. Dr. Cromer authorized plaintiff to work full duty but to avoid repetitive reaching, grasping, lifting, pushing or pulling with her right arm.
12. On April 13, 1999, Dr. Cromer saw plaintiff, at which time she complained of left arm symptoms and right ulnar neuropathic symptoms which he found were use-related. Plaintiff reported working considerable overtime, and Dr. Cromer ordered limited use of the right arm due to the use-related symptoms. There is insufficient evidence in the record to prove by the greater weight that this condition and the resulting restrictions were causally related to the electric shock injury of January 3, 1996.
13. Plaintiff reached maximum medical improvement and retained an 8 % permanent partial impairment to her right arm as a result of the shock incident as of April 20, 1999. However, Dr. Cromer continued the limited use of the right arm due to the use-related condition.
14. In April of 1999, plaintiff requested payment of additional benefits, which defendants denied due to lack of jurisdiction. After a hearing on April 14, 2000, Deputy Commissioner Dollar found that plaintiff was entitled to maintain an action for additional benefits, as there had been no final award by the Commission.
15. Although plaintiff testified at the hearing before Deputy Commissioner Dollar that she had other periods of time for which she was unable to work overtime after the date of the injury and for which she had not been paid, there is insufficient evidence in the record from which the Full Commission can find whether, as a result of the compensable injury, plaintiff worked restricted duty under physician's orders, and, if so, the periods of time for which she is entitled to additional temporary partial disability compensation.
16. By July 2, 1999, Dr. Cromer again found plaintiff had fully recovered from the shock injury, with the exception of some persistent right arm neuralgia. Dr. Cromer prescribed Neurontin. However, plaintiff complained of nightmares from the medication. By September 8, 1999, Dr. Cromer noted plaintiff should not work overtime until she was seen by Dr. Daniel Patterson, her personal psychiatrist. However, this referral was not due to any condition causally related to the compensable injury, but rather was due to her emotional state related to personal issues.
17. On September 22, 1999, Dr. George Edwards saw plaintiff for a right wrist ganglion cyst, which was not work-related. She was released to regular duty work and instructed to return if symptoms became more severe. Plaintiff did not return for additional treatment.
18. On December 29, 1999, plaintiff sought additional psychiatric treatment for depression following the break-up with fiancé Scott Clark. She also reported being angry regarding her work injury. Dr. Patterson diagnosed plaintiff with major depression, single episode, prescribed Celexa for the depression and recommended she go on disability status due to the depression. However, plaintiff advised she wished to continue to work on daytime schedule.
19. Between December 1999 and December 12, 2000, plaintiff was under Dr. Patterson's care for her depression, which was not causally related to her workers' compensation claim. Although plaintiff discussed issues related to her employer and the injury, her primary treatment was due to her personal relationship issues with Mr. Clark and the depression, which occurred as a result of their break-up.
20. Plaintiff was out of work from December 27, 1999 through February 21, 2000 on short-term disability due to her depression.
21. On January 13, 2000, Dr. Susan Torres conducted electrodiagnostic studies which were normal. There was no evidence of ulnar neuropathy.
22. Plaintiff was on unpaid FMLA leave due to personal or family matters from March 17, 2000 through May 15, 2000.
23. On March 10, 2000, plaintiff was taking Celexa for depression due to the break-up of her relationship with Mr. Clark and her concerns about her job. On examination, Dr. Cromer found plaintiff's right arm non-tender and no Tinel's sign over the ulnar notch. He diagnosed plaintiff with depression and right ulnar neuropraxia without evidence of neuropathy. The records reflect plaintiff was working full time without restrictions.
24. On May 31, 2000, Dr. Patterson restricted plaintiff to no overtime work. Dr. Cromer noted on June 7, 2000 that plaintiff was under Dr. Patterson's restrictions. Dr. Patterson later completed an FMLA certification on plaintiff's behalf. He noted plaintiff had a chronic major depression, not responding to medications, which began in December of 1999. Dr. Patterson estimated plaintiff should be able to return to work in December of 2000.
25. Between July 13 and July 20, 2000, plaintiff received short-term disability and from July 21 to July 28, 2000 she took FMLA unpaid leave. These absences were unrelated to her compensable injury.
26. Plaintiff was on short-term disability from September 5, 2000 through December 11, 2000 due to depression, which was not causally related to her compensable injury.
27. Between December 12, 2000 and February 19, 2001, plaintiff received short-term disability for a left bunionectomy, which was not related to the compensable injury.
28. On January 8, 2001, The Reed Group, Ltd., wrote to defendants, reciting the employee (plaintiff) was referred for medical disability case management post bunionectomy and at the employer's request. Reed conferred with Dr. Patterson at the employer's request for clarification regarding her disability status due to the depression after she requested disability benefits through the employer's plan. The letter provided, "Dr. Patterson advised he had documented and suggested this patient take some leave (FMLA) as she might benefit from that on an intermittent basis. However, he was very clear that he did not wish this employee to be off of work on disability as she is not disabled from Depression." Therefore, Reed Group did not recommend any disability for depression. On February 5, 2001, Dr. Patterson signed the letter, noting, "I agree with the above."
29. Plaintiff and Mr. Clark thereafter sent a five-page letter and questionnaire to Dr. Patterson in an attempt to get him to render a favorable opinion regarding the depression as a basis for short-term disability.
30. On or about March 7, 2001, Dr. Patterson noted on the letter from plaintiff and Mr. Clark as follows, "Call Scott and make clear I did not intend to complete and if forms I completed in the past were helpful, so be it."
31. On May 14, 2001, Dr. Cromer restricted plaintiff to no overtime work. This restriction was continued through October 2001. There is no evidence this restriction was causally related to the compensable injury.
32. Plaintiff was on unpaid FMLA leave from June 1 to June 5, 2001, and from August 2 to August 13, 2001 for non-work reasons.
33. Plaintiff was on short-term disability from August 14, 2001 through October 29, 2001 due to a right bunionectomy, which also was unrelated to her electric shock injury.
34. From October 30, 2001 through January 2002, plaintiff was on lay-off status from her employer. However, her inability to earn wages during this time was not due to the compensable injury, but rather was due to the economic conditions of her employer.
35. Dr. Jenkins was requested to reevaluate plaintiff. He was provided additional records for treatment rendered since February 19, 1999. During the course of the second evaluation on January 15, 2002, plaintiff reported she had gotten worse since being released by Dr. Cromer. She reported numbness, tingling and burning pain deep in the center of her right forearm. Following an examination, Dr. Jenkins found plaintiff's history was characterized by a pattern of purely subjective symptoms for which there was no organic basis. He found there to be no medical evidence plaintiff sustained any permanent functional impairment to her right arm or elsewhere from the January 3, 1996 electric shock injury.
36. At plaintiff's request, Dr. E. Wayne Massey of Duke University Medical Center examined plaintiff on June 3, 2002. Dr. Massey ordered diagnostic studies of bilateral ulnar and median nerves, which were reported as normal. Based upon objective clinical and electrical evaluations, Dr. Massey found that plaintiff sustained no nerve injury.
37. On February 6, 2002 and September 4, 2002, Dr. Cromer reevaluated plaintiff. She was again authorized to continue to work full duty, with no restrictions.
38. On January 29, 2003, Dr. Cromer diagnosed plaintiff with bilateral lateral epicondylitis and bilateral trapezius strain, which were unrelated to the electric shock incident. Dr. Cromer recommended that plaintiff go out of work, pending a psychiatric evaluation due to the extreme stress and anxiety of these complaints. These conditions, if related to her work, do not constitute a change of condition related to the electric shock, but rather are a new injury or occupational disease which occurred while Travelers, which is not a party to this action, was the carrier on the risk.
39. Plaintiff contends she is entitled to temporary partial disability benefits due to her inability to work overtime after April 23, 1996 when she returned to work with no restrictions. The competent evidence in the records supports a finding that plaintiff was authorized to work regular duty with no restrictions as of April 23, 1996, and any limited duty after this time was not due to the electric shock injury, but rather to other non-related conditions.
40. Between the date of the hearing and the close of the record, plaintiff was unable to work for unrelated personal medical reasons. However, she was not under any work restrictions during this time for the compensable electric shock injury. Therefore, any inability to earn wages was not casually related to the compensable injury.
41. At the hearing before Deputy Commissioner Dollar, plaintiff testified she had not been reimbursed for mileage and other out-of-pocket expenses. However, due to the vague nature of her testimony, plaintiff's counsel was ordered to provide specific dates and sums to which his client contended she had not been paid. Correspondence directed to the carrier with a July 30, 2002 memorandum reflects plaintiff was not reimbursed for her doctors' appointments on April 13, 1999, May 6, 1999, August 4, 1999, September 29, 1999, December 22, 1999, December 29, 1999, January 13, 2000, January 20, 2000, June 7, 2000, June 22, 2001, July 20, 2001, January 15, 2002, February 6, 2002, June 3, 2002, and July 17, 2002.
42. Plaintiff claimed reimbursement for 184 miles for June 22, 2001 and July 20, 2001 appointments with Dr. Cromer and 302 miles for the February 6, 2002 appointment. It appears from the oral arguments before the Commission that plaintiff temporarily resides in Raleigh. Until plaintiff's legal residence changes, she is only entitled to travel reimbursement from her home in Leland to Dr. Cromer's office in Wilmington. Theexpense reimbursements in question may not properly be considered without additional justification or explanation by plaintiff as to why these amounts are so far in excess of the other mileage claims.
43. Plaintiff claimed reimbursement for mileage for appointments with Dr. Patterson. However, as these appointments were for treatment unrelated to the compensable injury by accident, plaintiff is not entitled to reimbursement for mileage.
44. According to plaintiff's W2 statements, she earned the following wages: 1994-$33,600.48; 1995-$31,559.26; 1997-$31,685.96; 1998-$28,936.28; 1999-$37,974.01; and 2000-$24,603.27.
45. The Full Commission finds although plaintiff contended she earned less wages due to overtime restrictions after she returned to work with no restrictions, the greater weight of the evidence supports a finding that any reduction in her wage earning was not as a result of her compensable injury but due to a combination of her various absences for unrelated causes, as well as due to economic changes in the fiber optic cable industry and the demand for the products from the employer.
46. Defendants have not defended this action without reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and the extent of disability. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). Plaintiff has an ongoing presumption of disability based upon the Form 21 Agreement approved by the Commission. Kisiah v. W.R. Kisiah Plumbing, 124 N.C. App. 72,476 S.E.2d 424 (1996), disc. review denied, 345 N.C. 343,483 S.E.2d 169 (1997); Franklin v. Broyhill Furniture Industries,123 N.C. App. 200, 472 S.E.2d 382, cert. denied, 344 N.C. 629,477 S.E.2d 39 (1996). After the presumption attaches, the burden shifts to defendants to come forward with evidence that plaintiff is employable by showing that plaintiff is capable of earning the same wages as before the injury or by showing plaintiff's capacity to earn lesser wages than before the injury. In re Stonev. G G Builders, 346 N.C. 154, 484 S.E.2d 365 (1997); Franklinv. Broyhill Furniture Industries, supra. In the instant case, defendants have successfully rebutted the presumption of continued disability by showing suitable work has been available for plaintiff since Dr. Cromer released her; and she has been performing said work since April 23, 1996.
2. As the result of the compensable injury, plaintiff's wage earning capacity was diminished and she is entitled to temporary partial disability compensation at the rate of two-thirds of the difference between her pre-injury wage and her actual earnings during the period from January 3, 1996 and April 23, 1996. N.C. Gen. Stat. § 97-30. Defendants are entitled to a credit for any disability compensation already paid to plaintiff for this period. Plaintiff is not entitled to additional benefits after April 23, 1996, as there is insufficient evidence to support a finding that any reduction in her wage earning capacity was due to the electric shock injury.
3. Plaintiff is entitled to permanent partial disability compensation at the rate of $492.00 per week for 19.2 weeks as a result of the eight percent (8%) permanent partial impairment to the right arm. N.C. Gen. Stat. § 97-31(13).
4. Plaintiff is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability for the electric shock injury. N.C. Gen. Stat. §§ 97-2(19); 97-25. The authorized medical treatment includes care rendered by Dr. Cromer and he is approved as her treating physician. Plaintiff is not entitled to have defendants provide treatment under this claim for her bilateral epicondylitis or trapezius strain. She is likewise not entitled to have defendants provide treatment for her unrelated depression or other unrelated health conditions.
5. Plaintiff is entitled to reimbursement for travel to appointments with Dr. Cromer on June 22, 2001, July 20, 2001 and February 6, 2002. It is the responsibility of plaintiff and her counsel to submit additional justification to the carrier to explain the excessive mileage claims.
6. The defense of this claim was reasonable and not stubborn, unfounded litigiousness and, therefore, plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparksv. Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575
(1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below and a credit for amounts already paid, defendants shall pay plaintiff temporary partial disability compensation at the rate of two-thirds of the difference between the pre-injury and post-injury wages, if any, for the period from January 3, 1996 through April 23, 1996. Said compensation has accrued and shall be paid in a lump sum.
2. Subject to a reasonable attorney's fee approved below, defendants shall pay plaintiff permanent partial disability compensation at the rate of $492.00 per week for 19.2 weeks. Said compensation has accrued and shall be paid in a lump sum.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraphs 1 and 2 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel.
4. Defendants shall pay medical expenses incurred when bills for the same have been approved, in accordance with the provisions of the Act.
5. Dr. Cromer is approved as plaintiff's treating physician.
6. Plaintiff shall submit additional justification to the carrier regarding her mileage requests for June 22, 2001, July 20, 2001 and February 6, 2002. Counsel for both parties shall confer to resolve issues regarding travel reimbursement. As long as plaintiff's legal residence remains in Leland, defendants are responsible only for payment of travel from Leland to doctors' appointments.
7. Defendants shall pay the costs.
This the 22nd day of June 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
LKM/kjd